IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 20-cv-03319-PAB-SKC

ROBERT O. CARR,
TWENTY ON 23RD, LLC,
TOWNHOMES ON CONEJOS, LLC,
FOUR ON LOWELL BLVD, LLC, and
SIXTEEN ON IRVING STREET, LLC,

    Plaintiffs,

v.

RICKI WELLS (a/k/a RICK WELLS),
RISE DEVELOPMENT, LLC, and
ADVANCED EQUITY, LLC,

    Defendants.

---

**ORDER**

---

    This matter is before the Court on defendants' Motion to Partially Dismiss First

Amended Complaint [Docket No. 32] and defendants' Motion to Transfer Venue

(Resubmitted) [Docket No. 34].  Plaintiffs responded to both motions, Docket Nos. 35,

36, respectively, and defendants replied.  Docket Nos. 40, 39, respectively.  The Court

has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

**I.  BACKGROUND**[1]

    This action is brought by Robert O. Carr ("Carr"); Twenty on 23rd, LLC;

Townhomes on Conejos, LLC; Four on Lowell Blvd, LLC; and Sixteen on Irving Street,

---

[1] The following facts, which are assumed to be true, *see Brown v. Montoya*, 662
F.3d 1152, 1162 (10th Cir. 2011), are taken from plaintiffs' first amended complaint
("FAC") [Docket No. 19-1].

LLC (the LLCs are collectively referred to as the "Owner Entities").  Docket No. 19-1 at

1.  Plaintiffs bring this action against Ricki Wells ("Wells"); Rise Development, LLC;

("Rise"); and Advanced Equity, LLC ("Advanced").  *Id.*[2]

In September 2017, Carr, Wells, and Cheri Silard entered into an agreement (the

"Original Agreement") concerning the financing, development, and sale of multi-family

housing units in Denver, Colorado.  *Id.* at 4, ¶ 23.  Under the Original Agreement, Carr

was to provide financing for the construction projects, and Wells, Rise, and Advanced

were to provide development and other construction services.  *Id.*, ¶ 24.  Silard

participated in the "formation of the overall venture."  *Id.*  Later, on or about May 13,

2019, the Owner Entities, Wells, Rise, and Advanced entered into a "Real Estate

Project Development Agreement" (the "Denver Development Agreement" or "DDA")

concerning the financing, development, and sale of specific multi-family housing units in

Denver that were owned and financed by Carr and the Owner Entities.  *Id.* at 5, ¶ 25.

The DDA incorporates the terms of the Original Agreement.  *Id.*, ¶ 27.[3]

Ultimately, Carr financed the construction of 54 housing units through the Owner

Entities at four locations in Denver: 20 units at Twenty on 23rd, LLC; 16 units at Sixteen

on Irving, LLC; four units at Four on Lowell, LLC; and 14 at Townhomes on Conejos,

---

[2] Mr. Carr is a citizen of New Jersey.  *Id.* at 1, ¶ 1.  The Owner Entities, of which
Mr. Carr is the sole member, are also citizens of New Jersey.  *Id.* at 2, ¶¶ 2–3.  Mr.
Wells is a citizen of Arizona, and so are the other three members of Rise and
Advanced, *id.* at 2–3, ¶¶ 4–6, 12, which makes Rise and Advanced Arizona citizens.

[3] As relevant here, Section 11.07 of the DDA provides, among other things, that
any action arising out of the DDA would be "deemed to have arisen from a transaction
of business in the State of Colorado," shall be brought in federal or state courts in
Colorado, and shall be governed by Colorado law.  *Id.*, ¶¶ 29–31.

LLC (collectively, the "Projects").  *Id.* at 6, ¶ 35.

Section 4 of the Original Agreement provided that, once the Projects were finished and all money from the parties was received, Carr would be paid interest on his investment at the rate of 12% from the date of his investment until the date he was to be paid.  *Id.*, ¶ 37.  The Original Agreement also provided that, after payment of all expenses, including interest to Carr under Section 4, the remaining profits were to be divided equally between Carr, Wells, and Silard.  *Id.* at 7, ¶ 38.  Carr and Wells worked on the Projects, with Carr and the Owner Entities funding development, construction, and all other costs for the Projects and defendants agreeing to develop, construct, market, and sell the Projects, using funds that Carr provided.  *Id.*, ¶¶ 39–40.

At the end of 2018 and early 2019, Carr advised defendants that he would provide additional funds, but that defendants needed to obtain supplemental financing from commercial lenders to complete construction of the Projects.  *Id.*, ¶ 41.  Although Carr was willing to continue financing the Projects, he required that defendants provide accurate financial information on a timely basis about the Projects and comply with the term of the Denver Development Agreement.  *Id.*, ¶ 42.

In Section 1.01(w) of the DDA, the parties "acknowledged" the Original Agreement and "agreed to the terms of the financing of the Projects, the repayment to [Carr] of all investment funds with interest . . . as well as sharing in the net profits generated by the sale of all of the residential units in the Project."  *Id.* at 7–8, ¶ 44.  In Section 2.01 of the DDA, Wells and Rise agreed that they would "act in the best interest of the [Owner Entities] and the Project to maximize the overall net profit . . . so the

3

[Owner Entities would] be reimbursed for all construction costs and advances, all loans [would] be paid[,] and the parties [would] share in the net profits." *Id.* at 8, ¶ 45.  Wells and Rise also agreed, in Section 2.02 of the DDA, that they would not accept any compensation from anyone and that the only compensation defendants would be entitled to for the Projects would be a one-third share of the profits from the sale of the Projects. *Id.*, ¶ 46.  They agreed, in Section 2.04 of the DDA, that they would help the Owner Entities in selling the units in the Projects on the open market to bona-fide purchasers at market prices to maximize the Owner Entities' returns and would act in an "efficient, economic, and timely manner." *Id.*, ¶ 47.

In Section 3 of the DDA, Wells and Rise agreed that they were responsible for budgeting, cost monitoring and reporting, project administration, review and processing of payment requests, and record-keeping for the Projects. *Id.* at 8–9, ¶ 48.  This included a requirement that Wells and Rise monitor the Projects' costs and send monthly email updates to plaintiffs, detailing "all costs and expenses that have been incurred, all accumulated but unpaid costs and expenses[,] as well as forecasted future costs and expenses" related to each unit in the Projects.  *Id.* at 9, ¶ 49.  They also agreed to provide the details to calculate the unit costs for each unit on an ongoing basis and would provide a "status of the Project, including confirmation that the Project Schedule and Development Budget [were] being complied with, or an explanation of any deviations . . . together with such additional reports as [the Owner Entities] may reasonably require."  *Id.*, ¶ 50.  Wells and Rise were to email monthly reports on payments and accrued interest to plaintiffs to account for payments made by plaintiffs

to fund the Projects on a unit-by-unit basis until the sale of all units were sold, as well as on forecasted sales prices and final costs for each unit. *Id.* at 9–10, ¶¶ 51–52. Wells and Rise agreed to maintain certain financial records and financial accounting and controls and to immediately provide to Owner Entities electronic copies of the General Ledger for the Project for 2017 to 2019, showing disbursements and receipts, and access to all related bank accounts. *Id.* at 10, ¶ 54. Section 3 of the DDA required Wells and Rise, after substantial completion of the Project, to obtain the Owner Entities' approval for all final sales prices and contracts for sale for each unit. *Id.*, ¶ 53. All net proceeds of each unit sale were to be wired directly to the trust account of the Owners Entities' counsel. *Id.*

Defendants agreed to be responsible for all cost overruns and to pay any such overruns directly to the Owner Entities or have the overruns be deducted from proceeds to which Wells and Rise would otherwise be entitled. *Id.* at 10–11, ¶ 55. Wells and Rise would provide a cost overrun guaranty in favor of Owner Entities, guaranteeing final completion of the Project and payment of cost overruns. *Id.* at 11, ¶ 57. Within 20 days of the completion of the work on any condominium unit, Wells and Rise would provide to the Owner Entities for their approval a reconciliation of the project costs and the costs actually expended, pursuant to Section 4.03 of the DDA. *Id.*, ¶ 56.

Section 8.02 of the DDA gives the Owner Entities "sole authority to exercise any and all rights and remedies available at law or in equity, including, without limitation, the right to terminate the [DDA]" in the event of a default of Wells or Rise and provides the Owner Entities remedies of specific performance, injunctive relief, or other equitable

remedies in the event breach or threatened breach.  *Id.*, ¶¶ 58–59.

Throughout the development and construction of the Projects, Carr funded the Owner Entities, which made payments under the Original Agreement and DDA as Wells, Rise, and Advanced requested, and the Projects were completed and sold between 2019 and 2020.  *Id.*, ¶¶ 60–61.  Around the time that the last unit was sold, Wells represented to Carr that the Projects had been profitable, and, on September 22, 2020, Carr requested additional information to substantiate Wells's representation.  *Id.* at 12, ¶¶ 63–64.  After Carr received no response from Wells, Carr's attorney communicated with Wells and sent a follow-up email on October 15, 2020, reminding Wells of his obligations under the DDA, including that Wells maintain all Project documents and records and provide a reconciliation of expected and actual Project costs.  *Id.*, ¶¶ 65–66.  Carr's lawyer also requested certain documents and records from Rise and Wells, but received no information as of February 12, 2021.  *Id.* at 12–13, ¶¶ 67–68.

Plaintiffs have invested approximately $18,997,905.00 into the Projects, along with "millions in acquisition costs."  *Id.* at 13, ¶ 69.  As part of that overall figure, plaintiffs directly paid Wells and Rise approximately $7,798,705.00 and Wells and Advanced approximately $2,776,373.00, none of which defendants have fully accounted for.  *Id.*, ¶¶ 70–71.  As of the date of the lawsuit, plaintiffs have not been fully repaid their investment in the Project, with interest, as required by the Original Agreement and DDA.  *Id.*, ¶ 72.  Plaintiffs estimate that the amount due for just the unpaid interest exceeds $3,800,000.00.  *Id.*, ¶ 73.  Defendants provided Carr with

original estimates of the overall costs and projected revenue for the Projects and, based on that information, Carr expected to be repaid all of his investment plus interest, for a profit in excess of $1,000,000.00.  *Id.*, ¶ 74.

Plaintiffs bring three claims for relief: (1) breach of contract and breach of the implied covenant of good faith and fair dealing; (2) unjust enrichment; and (3) breach of fiduciary duty.  *Id.* at 14–17, ¶¶ 78–98.  Defendants have filed a motion to partially dismiss the FAC, *see* Docket No. 32, as well as a motion to transfer this case to the District of Arizona.  *See* Docket No. 34.  The Court considers the motion to transfer first because, if transfer is appropriate, defendants' motion to dismiss is moot.

## II.  CHOICE OF LAW

As an initial matter, the Court notes that, because jurisdiction is based on diversity, the Court applies Colorado law.  *See Essex Ins. Co. v. Vincent*, 52 F.3d 894, 896 (10th Cir. 1995); *Boyd Rosene & Assocs., Inc. v. Kan. Mun. Gas Agency*, 174 F.3d 1115, 1118 (10th Cir. 1999) (noting that, under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), a federal court sitting in diversity applies the substantive law of the forum state).  Moreover, the parties acknowledge that the DDA contains a choice-of-law provision at Section 11.05, which states that the DDA "shall be governed and construed in accordance with the laws of the State of Colorado," *see* Docket No. 19-1 at 116, and the parties' briefing almost exclusively relies on Colorado law.

## III.  MOTION TO TRANSFER

### A.  Legal Standard

Section 1404(a) of Title 28 provides, in pertinent part, that, "[f]or the convenience

of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  Section 1404(a) is "intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'"  *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)).  To warrant a transfer, the moving party must establish that: (1) the action could have been brought in the alternate forum; (2) the existing forum is inconvenient; and (3) the interests of justice are better served in the alternate forum.  *Wolf v. Gerhard Interiors, Ltd.*, 399 F. Supp. 2d 1164, 1166 (D. Colo. 2005) (citing *Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1515 (10th Cir. 1991)).  As the party seeking transfer of this action pursuant to section 1404(a), defendants "bear[] the burden of establishing that the existing forum is inconvenient."  *Chrysler Credit Corp.*, 928 F.2d at 1515.

### B.  Analysis

Defendants seek to transfer this case to the District of Arizona.  Docket No. 34 at 1.  There is no dispute that the District of Arizona would be a proper venue for this action.  *See* Docket No. 36 at 2 n.1; 28 U.S.C. § 1391(b)(2).  Therefore, defendants have satisfied the first element.  *See Wolf*, 399 F. Supp. 2d at 1166.

Courts weigh a number of private and public interest factors in determining whether transfer is appropriate under § 1404(a).  *See Lawson v. Glob. Payments Inc.*, 18-cv-03360-PAB-SKC, 2019 WL 4412271, at *2 (D. Colo. Sept. 16, 2019).  Relevant private interests include "relative ease of access to sources of proof; availability of

compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. Tex.*, 571 U.S. 49, 62 n.6 (2013) (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)). Public interest factors include: "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; and the interest in having the trial of a diversity case in a forum that is at home with the law." *Id.* (citation and bracket omitted).

In the ordinary case, the party seeking transfer under § 1404(a) bears the "burden of establishing that the existing forum is inconvenient." *Chrysler Credit Corp.*, 928 F.2d at 1515. The analysis changes, however, when a motion for transfer is based on an applicable, mandatory, valid, and enforceable forum-selection clause. *See Atl. Marine Constr. Co.*, 571 U.S. at 62; *cf. Azima v. RAK Inv. Auth.*, 926 F.3d 870, 875 (D.C. Cir. June 18, 2019) (discussing analysis that applies when motion to dismiss for *forum non conveniens* is based on an "applicable, mandatory, valid, and enforceable" forum-selection clause). First, "the plaintiff's choice of forum merits no weight" and "the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted." *Atl. Marine Constr. Co.*, 571 U.S. at 63. Second, the court resolving the transfer motion may consider only public-interest factors and not the parties' private interests on the premise that parties who agree to a forum-selection clause "waive the right to challenge the preselected forum as inconvenient or less

convenient." *Id.* at 64. "Public-interest factors may include 'the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law.'" *Id.* at 62 n.6 (quoting *Piper Aircraft Co.*, 454 U.S. at 241 n.6). Finally, the "transfer of venue will not carry with it the original venue's choice-of-law rules." *Id.* at 51. The practical effect of this is that "forum-selection clauses [will] control except in unusual cases." *Id.*

Before applying this modified analysis, the Court must determine whether a valid and enforceable forum-selection clause applies to the parties' dispute. A mandatory forum-selection clause is presumed valid "unless the party challenging it clearly shows that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Niemi v. Lasshofer*, 770 F.3d 1331, 1351 (10th Cir. 2014) (internal quotation marks and bracket omitted) (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)). A forum-selection clause is mandatory if it "contains clear language showing that jurisdiction is appropriate only in the designated forum." *K & V Scientific Co., Inc. v. Bayerische Motoren Werke Aktiengesellschaft*, 314 F.3d 494, 498 (10th Cir. 2002). The Court will, therefore, begin its analysis with whether the forum-selection clause at issue in this case is mandatory or permissive and then will turn to whether the clause is valid.

Plaintiffs allege that, pursuant to Section 11.07 of the DDA, Wells and Rise "consented to the venue and jurisdiction of this Court over: (a) any proceeding to enforce the terms of the DDA, or (b) any dispute arising out of or in connection with the

DDA." Docket No. 19-1 at 5, ¶ 29. Although plaintiffs do not provide the full text of Section 11.07 within the FAC, the DDA is appended as an exhibit. *See id.* at 97–120. Section 11.07 states, in relevant part,

> The parties hereby agree that any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, the [DDA] shall be brought in the federal or state courts of the State of Colorado, so long as such courts shall have subject-matter jurisdiction over such suit, action, or proceeding, and that any cause of action arising out of this agreement shall be deemed to have arisen from a transaction of business in the State of Colorado. Each of the parties hereby irrevocably consents to the jurisdiction of such courts . . . in any such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding that is brought in any such court has been brought in an inconvenient forum.

*Id.* at 116.

Defendants argue that the forum-selection clause in Section 11.07 is permissive, rather than mandatory. Docket No. 34 at 11–14. Defendants' main argument is that, although the forum-selection clause states that an action "*shall* be brought in the federal or state courts of the State of Colorado," *see* Docket No. 19-1 at 116, that language is merely permissive because "shall" is not "specific language of exclusion." Docket No. 34 at 12–13. In defendants' view, only words such as "sole," "only," or "exclusive" constitute language of exclusion. Defendants rely principally on *BAE Systems Technology Solutions & Services, Inc. v. Republic of Korea's Defense Acquisition Program Administration*. In that case, the Fourth Circuit held that "the use of 'shall' in a forum selection clause is not dispositive, because, in context, the clause may still 'permit[] jurisdiction in one court but . . . not prohibit jurisdiction in another.'" 884 F.3d

463, 472 (4th Cir. 2018).

Defendants' reliance, however, is misplaced, as the forum-selection clause at issue in that case is not similar to the clause in this case.  In *BAE Systems*, the parties agreed that any "dispute arising from or relating to the BAE-Korea agreement 'shall be resolved through a litigation and the Seoul Central District Court shall hold jurisdiction.'" *Id.* at 470.  The court explained that a "mandatory clause requires litigation to occur in a specified forum; a permissive clause permits litigation to occur in a specified forum but does not bar litigation elsewhere." *Id.*  The court then explained that the clause "simply confers jurisdiction on a forum." *Id.* at 472.  In other words, the clause provided that the Seoul District Court had jurisdiction to hear the parties' case, but it did not specify that the Seoul District Court was the *only* court to have jurisdiction. *Id.*

The Fourth Circuit relied on a Tenth Circuit case that makes this distinction even clearer. *See id.* (citing *Excell, Inc. v. Sterling Boiler & Mech., Inc.*, 106 F.3d 318, 321 (10th Cir. 1997)).  In *Excell*, the court distinguished a permissive clause using "shall" from a mandatory clause also using "shall."  106 F.3d at 321.  The court provided an example of a permissive forum-selection clause: "The parties agree that in the event of litigation between them, Franchise Owner stipulates that the courts of the State of Michigan *shall* have personal jurisdiction over its person, that it shall submit to such personal jurisdiction, and that venue is proper in Michigan." *Id.* (citation omitted; emphasis added).  This is very similar to the clause in *BAE Systems*, which permitted the Seoul District Court to hear the dispute.  The court in *Excell* also provided an example of a mandatory forum selection clause: "[j]urisdiction *shall* be in the State of

12

Colorado." *Id.* (emphasis added).

These examples and the analysis in *BAE Systems* and *Excell* show that the forum-selection clause in this case is mandatory. Unlike the permissive forum-selection clause in *BAE Systems* and the example of the permissive clause in *Excell*, the clause in this case does not simply provide the parties the option to bring their dispute in Colorado; the clause requires it by use of the word "shall." Docket No. 19-1 at 116 ("The parties hereby agree that any suit . . . arising out of or in connection with, the [DDA] *shall* be brought in the federal or state courts of the State of Colorado." (emphasis added)); *see also Excell*, 106 F.3d at 321 ("Keeping in mind the mandatory/permissive dichotomy, and giving the language of the clause its plain meaning, we conclude the clause is mandatory and requires that any breach of contract action be brought and litigated in the District Court of El Paso County, Colorado."); *Milk 'N' More, Inc. v. Beavert*, 963 F.2d 1342, 1346 (10th Cir. 1992) (holding that the use of the word "shall" in a forum selection clause indicated a "mandatory intent"); *Intermountain Sys., Inc. v. Edsall Constr. Co.*, 575 F. Supp. 1195, 1197 (D. Colo. 1983) (finding the clause "It is agreed for purposes of this agreement, venue shall be in Adams County, Colorado." to be mandatory).[4]

Having found that the forum-selection clause is mandatory, the Court next

---

[4] Defendants additionally argue that the waiver language in Section 11.07 does not mean that the clause is mandatory. Docket No. 34 at 13 (citing Docket No. 19-1 at 116 ("Each of the parties hereby irrevocably consents to the jurisdiction of such courts . . . in any such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court")). The Court does not reach this argument because the Court finds that the clause is mandatory.

considers whether the clause is valid.  Defendants argue that the clause is not valid, and therefore is not enforceable, because "it was procured under duress."  Docket No. 34 at 8.  "Forum selection provisions are '*prima facie* valid' and a party resisting enforcement carries a heavy burden of showing that the provision itself is invalid due to fraud or overreaching or that enforcement would be unreasonable and unjust under the circumstances."  *Riley v. Kingsley Underwriting Agencies, Ltd.*, 969 F.2d 953, 957 (10th Cir. 1992) (citing *M/S Bremen*, 407 U.S. at 10).

Defendants argue that Wells's and Rise's execution of the DDA were "procured via an improper economic threat by Carr" because, at the time the DDA was executed, Carr had ceased funding the Projects.  Docket No. 34 at 8.  When this happened, according to defendants, the builder threatened to stop working unless it was paid, and Wells was forced to locate alternative financing.  *Id.*  Defendants contend that the new lenders that Wells found agreed to finance the projects only if Carr personally guaranteed the loans; however, Carr refused unless Wells and Rise signed the DDA. *Id.*  As a result, defendants claim that Wells "had no reasonable alternative" but to sign the DDA.  *Id.* at 8–9.

"Under general contract principles, it is well established that a contract is void and unenforceable if procured through fraud."  *Bennett v. Coors Brewing Co.*, 189 F.3d 1221, 1229 (10th Cir. 1999) (citing Restatement (Second) Contracts § 164(1) (1981) ("If a party's manifestation of assent is induced by a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient"); *Shaheen v. B.F. Goodrich Co.*, 873 F.2d 105,

14

107 (6th Cir. 1989) ("Properly executed waivers of possible employment-related discrimination claims knowingly and voluntarily made between an employee and his employer will be enforced absent the typical exceptions for fraud, duress, lack of consideration or mutual mistake.")).

"A contract is voidable on the grounds of duress if a party's manifestation of assent is induced by an improper threat that leaves no reasonable alternative." *Conagra Trade Grp., Inc. v. Fuel Expl., LLC*, 636 F. Supp. 2d 1166, 1173 (D. Colo. 2009) (quoting *Vail/Arrowhead, Inc. v. Dist. Ct. for Fifth Jud. Dist., Eagle Cnty.*, 954 P.2d 608, 612 (Colo. 1998)); *Premier Farm Credit, PCA v. W-Cattle, LLC*, 155 P.3d 504, 521 (Colo. App. 2006). However, not all coercive business practices amount to duress. *See Cooper v. Flagstaff Realty*, 634 P.2d 1013, 1015 (Colo. App. 1981). A party that coerces another into signing a contract by threatening to take an action that it has a legal right to take does not inflict duress sufficient to void the contract. *See DeJean v. United Airlines, Inc.*, 839 P.2d 1153, 1160 (Colo. 1992); *Cooper*, 634 P.2d at 1015.

The party claiming duress must show that the "force or threats employed actually subjugated the mind and will of the person against whom they were directed, and were thus the sole and efficient cause of the action which he took." *Wiesen v. Short*, 604 P.2d 1191, 1192 (Colo. App. 1979) (quoting *Hastain v. Greenbaum*, 470 P.2d 741, 747 (Kan. 1970)). Courts are to "look to the effect of any threat on the recipient and whether the threat effectively removed the recipient's ability to select a reasonable alternative to executing the challenged contract." *Conagra Trade Grp.*, 636 F. Supp. 2d

15

at 1173 (citing *Vail/Arrowhead*, 954 P.2d at 613 ("An improper threat does not

constitute economic duress if the victim fails to pursue a reasonable alternative but

instead yields to the threat."); *Wiesen*, 604 P.2d at 1192 (notwithstanding threats of

litigation, court declined to invalidate an agreement when party "discussed [the] matter

with a lawyer, and had an opportunity to reflect")).

In reviewing whether the recipient of a threat was deprived of a reasonable

alternative, courts look to the parties' agreement; "if the resulting agreement is shocking

or unreasonably unfair, the implication is that the threat was sufficiently coercive and

duress is a valid basis to void the contract." *Id.* (citing *Vail/Arrowhead*, 954 P.2d at 613

("The fairness of the resulting exchange is often a critical factor in cases involving

threats.")).  However, "if the agreement appears reasonable, the implication is that

duress was not a factor in its formation." *Id.*

Defendants argue that they had no choice but to sign the DDA because that was

their only way to obtain financing after Carr "ceased all funding for the Projects [in]

violation of his obligations" under the Original Agreement.  Docket No. 34 at 8–9.  Even

assuming defendants' recounting of these events to be true, the Court does not find

that this pressure amounted to duress.  Defendants have not shown that Carr's actions

"actually subjugated the mind and will of [defendants]" or "were thus the sole and

efficient cause" of defendants signing the DDA.  *See Wiesen*, 604 P.2d at 1192.  Nor

was signing the DDA under Carr's terms the only option defendants could have

pursued.  They could, for instance, have sought an injunction against Carr or

immediately sued him for breach of contract.  The Colorado Supreme Court has stated

that "[a]n improper threat does not constitute economic duress if the victim fails to

16

pursue a reasonable alternative but instead yields to the threat." *Vail/Arrowhead*, 954 P.2d at 613. Because defendants had reasonable alternatives, the Court does not find that Carr's pressure amounted to duress.

The Court also finds unconvincing defendants' arguments that the terms of the DDA were "shocking or unreasonably unfair." *See Conagra Trade Grp.*, 636 F. Supp. 2d at 1173. Defendants claim that the terms of the DDA amounted to duress because "the resulting exchange [i.e., the DDA] was not on fair terms," and Carr had a history of "prior unfair dealing" and threats of "us[ing] his power for illegitimate ends." Docket No. 34 at 9–10. Defendants contend that the DDA was unfair because (1) it was drafted by Carr's counsel; (2) it contains a Colorado choice-of-law provision; (3) it waives the right to a jury trial; (4) it contains provisions for defendants' default but not for plaintiffs'; (5) the parties have different representations and warranties; (6) it makes defendants solely responsible for cost overruns even though plaintiffs have sole authority to authorize payment; and (7) it contains reporting requirements for defendants but none for plaintiffs. *Id.* at 10.[5]

---

[5] These concerns are echoed in the declaration from Wells attached to the motion to transfer, *see id.* at 17–21, which the Court considers on a motion to transfer. *See Bukhari v. Deloitte & Touche LLP*, 2012 WL 5904815, at *2 (S.D.N.Y. Nov. 26, 2012) ("[T]he party requesting transfer carries the burden of making out a strong case for transfer, and, to prevail, must make a clear and convincing showing that transfer is proper." (citing *N.Y. Mar. & Gen. Ins. Co. v. Lafarge N.A., Inc.*, 599 F.3d 102, 112 (2d Cir. 2010) (internal quotations and citations omitted)); *Citibank, N.A. v. Affinity Processing Corp.*, 248 F. Supp. 172, 176 (E.D.N.Y. 2003) ("The defendant must support [a Section 1404(a)] motion with affidavits and other materials outside the pleadings."); *Huang v. Napolitano*, 721 F. Supp. 2d 46, 47 n.2 (D.D.C. 2010) ("In reviewing a motion to transfer under 28 U.S.C. § 1404(a), a court may consider undisputed facts outside the pleadings ."); *Ancient Sun Nutrition, Inc. v. Or. Algae, LLC*, 2010 WL 3719503, at * 1 (W.D.N.C. Sept. 17, 2010) ("Unlike a Rule 12(b) motion, which is limited to facts contained in the Complaint, a motion to transfer allows for

Defendants provide no argument for why these terms are shocking or unreasonably unfair, and the Court does not find them to be.  For example, the fact that Carr's counsel drafted the agreement makes sense in light of Carr providing the financing.  The Colorado choice-of-law provision is also reasonable given that Colo. Rev. Stat. § 13-21-111.5(6)(g) requires, "[n]otwithstanding any contractual provision to the contrary, the laws of the state of Colorado shall apply to every construction agreement affecting improvements to real property within the state of Colorado." Waiver of jury trial is not shocking or unfair, as parties often waive their rights to jury trials, and there is no suggestion that any of the parties was unsophisticated or unrepresented by counsel.  *See, e.g.*, *Cellport Sys., Inc. v. Peiker Acustic GmbH & Co. KG*, 847 F. Supp. 2d 1293, 1303 (D. Colo. 2012) (citing *Telum, Inc. v. E.F. Hutton Credit Corp.*, 859 F.2d 835, 837 (10th Cir. 1988)).  It is also not shocking that a lender and builder may have different responsibilities, obligations, and reporting requirements given their different roles in developing a property.

Finally, defendants have provided no argument that the forum-selection clause itself, as opposed to the DDA as a whole, was the product of duress.  The Colorado Court of Appeals has explained that, "to render a forum selection clause unenforceable, the party seeking to avoid the clause must show that the clause itself was procured by fraud."  *Edge Telecom, Inc. v. Sterling Bank*, 143 P.3d 1155, 1162 (Colo. App. 2006)

---

review of materials submitted outside the pleadings."); *Andrade v. Chase Home Fin., LLC*, 2005 WL 3436400, at *2 (N.D. Ill. Dec. 12, 2005) ("When deciding a motion to transfer venue, the court must accept as true all of plaintiff's well-pleaded facts in the complaint, unless they are contradicted by affidavits or other appropriate evidence from the defendant.").

(citing *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 n.14 (1974) ("an arbitration or forum-selection clause in a contract is not enforceable if the inclusion of that clause in the contract was the product of fraud or coercion"); *REO Sales, Inc. v. Prudential Ins. Co.*, 925 F. Supp. 1491, 1493–95 (D. Colo. 1996) (holding that, if a forum-selection clause were to be rejected whenever a plaintiff asserted a generic claim of fraud in the inducement, then forum-selection clauses would be rendered essentially meaningless)).

As the Supreme Court held in *Atlantic Marine*, a valid and applicable forum-selection clause must be given effect "[i]n all but the most unusual cases." 571 U.S. at 66. Because the forum-selection clause at issue in this case is mandatory and valid, the Court need not consider the private-interest factors mentioned above. *See, e.g.*, *Azima*, 926 F.3d at 875 ("if we are dealing with an applicable, mandatory, valid, and enforceable forum-selection clause, we need not ask whether the location it identifies is available, adequate, or best for the parties' private interests" because the clause "'represents the parties' agreement as to the most proper forum,'" meaning the Court "can assume that [the parties] selected [a forum] adequate to litigate their claims and to protect their private interests" (quoting *Atl. Marine*, 571 U.S. at 63–64)).

Mindful of the Supreme Court's admonition that public-interest factors "will rarely defeat a transfer motion" and that "the practical result [of mandatory, valid forum-selection clauses] that forum-selection clauses should control except in unusual cases," *see Atl. Marine*, 571 U.S. at 64, the Court finds that the public-interest factors do not change the Court's conclusion. If anything these factors weigh in favor of denying defendants' motion. For instance, there may be an interest in "having [a] localized

controvers[y] decided" here or in "having the trial of a diversity case in a forum that is at home with the law.'"  *Id.* at 62 n.6 (quoting *Piper Aircraft Co.*, 454 U.S. at 241, n.6).  The Court, however, does not afford great weight to these factors.  For these reasons, defendants' motion to transfer this case to the District of Arizona will be denied.

## III.  MOTION TO DISMISS

### A.  Legal Standard

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face."  *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible."  *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)).  Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'"  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (alterations omitted).  However, a plaintiff still must provide "supporting factual averments" with her allegations.  *Cory v. Allstate Ins.*, 583 F.3d 1240, 1244 (10th Cir. 2009) ("[C]onclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." (citation omitted)).  Otherwise, the court need not accept conclusory allegations.  *Moffet v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002).  "[W]here the

well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)).  If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim. *Khalik*, 671 F.3d at 1191 (quotations omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson*, 534 F.3d at 1286 (alterations omitted).

### B.  Analysis

As mentioned previously, plaintiffs bring three claims for relief: (1) breach of contract and breach of the implied covenant of good faith and fair dealing; (2) unjust enrichment; and (3) breach of fiduciary duty.  Docket No. 19-1 at 14–17, ¶¶ 78–98. Defendants style their motion to dismiss as a "Motion to Partially Dismiss Plaintiffs' First Amended Complaint," *see* Docket No. 32 at 1; however, defendants argue that "each of [p]laintiffs' claims for relief must be dismissed to the extent each relies on the validity of the DDA," which defendants claim was executed under duress.  *Id.* at 2.  Defendants also argue that plaintiffs' unjust enrichment claim should be dismissed because

plaintiffs do not allege that defendants' received a benefit at plaintiffs' expense.  *Id.*[6]

Defendants' first argument, namely, that the FAC should be dismissed because plaintiffs' claims are "grounded, to an extent, on the DDA," which was the product of duress, mirrors defendants' argument in their motion to transfer.  *Id.* at 5.  First, defendants contend that plaintiffs' claim for breach of contract should be dismissed because the contract allegedly breached is the DDA.  *Id.* (citing Docket No. 19-1 at 14 ¶ 82).  Second, defendants argue that the unjust enrichment claim must be dismissed because plaintiffs' allegation is that "defendants unjustly frustrated [p]laintiffs' ability to

---

[6] As an initial matter, the Court notes that defendants have attached a declaration from Wells to the motion, *see id.* at 13–17; however, the Court will not consider this document.  *See Strauss v. Angie's List, Inc.*, 951 F.3d 1263, 1267 (10th Cir. 2020); *Jojola v. Chavez*, 55 F.3d 488, 494 (10th Cir. 1995) ("[I]n determining whether to grant a motion to dismiss, the district court, and consequently this court, are limited to assessing the legal sufficiency of the allegations contained within the four corners of the complaint."); *Doyle v. Okla. Bar Ass'n*, 998 F.2d 1559, 1566 (10th Cir. 1993) (in reviewing an order granting a motion to dismiss, a court "confin[es] [its] review to the allegations of the complaint").

In reply, defendants ask the Court to consider evidence outside of the pleadings and to convert the motion to dismiss into a motion for summary judgment.  Docket No. 40 at 3–4.  The Tenth Circuit has held that a "motion to dismiss for failure to state a claim upon which relief can be granted must be converted into a motion for summary judgment whenever the district court considers matters outside the pleadings."  *Lowe v. Town of Fairland*, 143 F.3d 1378, 1381 (10th Cir. 1998).  However, the district court has "discretion to decide whether to convert a motion to dismiss into one for summary judgment."  *Poole v. Cnty. of Otero*, 271 F.3d 955, 958 (10th Cir. 2001) (citing *Lybrook v. Members of the Farmington Mun. Sch. Bd. of Educ.*, 232 F.3d 1334, 1341 (10th Cir. 2000) (rejecting argument that court abused its discretion in failing to convert a Rule 12(b)(6) motion into a summary judgment motion where the parties attached materials beyond the pleadings to their motions)), *abrogated on other grounds by Hartman v. Moore*, 547 U.S. 250 (2006).  The district court also has "broad discretion in determining whether to accept materials beyond the pleadings."  *Woodie v. Berkshire Hathaway Homestate Ins. Co.*, 806 F. App'x 658, 664 (10th Cir. 2020) (unpublished) (quoting *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017)).   The Court declines to exercise this discretion and does not consider materials outside of the pleadings.

account for the amounts due and owing to them under the . . . DDA." *Id.* (quoting
Docket No. 19-1 at 16, ¶ 92).  Third, defendants argue that plaintiffs' breach of fiduciary
duty claim is based on an alleged relationship of trust pursuant to the DDA.  *Id.* (citing
Docket No. 19-1 at 16, ¶¶ 94–96).

      Defendants' duress argument in the motion to dismiss is the same as their
duress argument in the motion to transfer.  *Compare* Docket No. 34 at 8–11 *with*
Docket No. 32 at 5–10.  In fact, many paragraphs are duplicates of each other.  One of
the only differences appears to be the contention that Wells was forced to sign the DDA
before his lawyer could review it.  Docket No. 32 at 8.  There are no facts supporting
this assertion in the FAC, and the Court, considering a motion to dismiss, does not
consider facts that do not appear in the complaint.  *See Strauss*, 951 F.3d at 1267;
*Jojola*, 55 F.3d at 494; *Doyle*, 998 F.2d at 1566.  This restriction applies equally to
plaintiffs' response to defendants' motion, which claims that Wells received the DDA,
which did not provide a deadline for execution, on May 14, 2019 and returned it on May
16, 2019.  *See* Docket No. 35 at 8.  Even if the Court could consider this information
from Wells, he has provided no dates or other facts that could support his argument
that he had no time to consult his lawyer before signing the DDA.  The Court previously
found defendants' duress arguments unconvincing in the context of the motion to
transfer and will not consider the arguments again.

      The Court next considers defendants' arguments that plaintiffs fail to plausibly
allege an unjust enrichment claim.  *See* Docket No. 32 at 10–11.  To state a claim for
unjust enrichment in Colorado, a plaintiff must show that "(1) at plaintiff's expense (2)

defendant received a benefit (3) under circumstances that would make it unjust for defendant to retain the benefit without paying." *Robinson v. Colo. State Lottery Div.*, 179 P.3d 998, 1007 (Colo. 2008); *see also Stone Creek Bus. Ctr., LLLP v. Stone Creek-Colo., LLC*, 20-cv-01413-PAB-GPG, 2021 WL 877716, at *8 (D. Colo. Mar. 9, 2021). "Unjust enrichment is a claim in quasi-contract based on principles of restitution." *W. Ridge Grp., LLC v. First Trust Co. of Onaga*, 414 F. App'x 112, 120 (10th Cir. 2011) (unpublished) (citing *DCB Constr. Co. v. Central City Devp. Co.*, 965 P.2d 115, 118 (Colo. 1998) (en banc)).

Plaintiffs allege that defendants received a benefit at plaintiffs' expense of over $10,575,078.00 in payments from plaintiffs to finance the Projects. Docket No. 19-1 at 15, ¶ 90. Specifically, plaintiffs allege that they "paid directly to Wells and Rise approximately $7,798,705.00" and "paid directly to Wells and [Advanced] approximately $2,776,373.00," none of which defendants have fully accounted for. *Id.* at 13, ¶¶ 70–71. Plaintiffs also allege that, because defendants did not "adequately account[] for the use of the funds" and have not "compensated [p]laintiffs for this benefit, it would be inequitable and unjust to permit the [d]efendants to receive and retain the benefit provided by [p]laintiffs without compensating [p]laintiffs for the reasonable value fo such benefit." *Id.* at 15–16, ¶ 91.

Defendants argue that plaintiffs' unjust enrichment claim "does not sufficiently allege that [d]efendants' themselves, as opposed to the Projects, received a benefit from [p]laintiffs." Docket No. 32 at 10. Defendants claim that plaintiffs' allegations only show that plaintiffs provided the $10,575,078.00 "to finance the Projects . . . which

Case 1:20-cv-03319-PAB-SKC   Document 41   Filed 03/28/22   USDC Colorado   Page 25 of 26

themselves were owned by Carr's companies, and, ultimately, by Carr himself." *Id.* Defendants insist that there is no allegation that defendants "improperly kept or misappropriated any of that money for their own personal benefit" and that plaintiffs' allegations are conclusory. *Id.* at 10–11. Defendants' argument is unconvincing. The Court assumes that the facts alleged in the complaint are true when resolving a motion to dismiss, *see Brown*, 662 F.3d at 1162, and, here, plaintiffs have plausibly alleged that they paid a benefit to defendants when they state that they paid various amounts of money "directly" to Wells, Rise, and Advanced. Moreover, plaintiffs allege that defendants failed to account for these payments, giving rise to the plausible inference that, in doing so, they are concealing the benefit that they obtained. *See* Docket No. 19-1 at 15–16, ¶ 91. Assuming the truth of these allegations, plaintiffs have plausibly established that defendants were unjustly enriched by these payments. The Court does not consider the other elements of plaintiffs' unjust enrichment claim, as defendants argue neither that the benefit was not at plaintiffs' expense or that it would be unjust for defendants to retain the benefit without paying. *See generally* Docket No. 32; *Robinson*, 179 P.3d at 1007. The Court will, therefore, deny defendants' motion to dismiss.

**V.  CONCLUSION**

For the foregoing reasons, it is

**ORDERED** that the Motion to Partially Dismiss First Amended Complaint [Docket No. 32] is **DENIED**. It is further

**ORDERED** that the Motion to Transfer Venue (Resubmitted) [Docket No. 34] is

25

**DENIED**.  It is further

       **ORDERED** that plaintiffs shall re-file the First Amended Complaint, Docket No.

19-1, as a separate docket entry.


       DATED March 28, 2022.

                    BY THE COURT:


                    PHILIP A. BRIMMER
                    Chief United States District Judge

26